**Thomas SHUPAK, Wilma Shupak, and Steven Shupak, Plaintiffs,**

**v.**

**NEW YORK LIFE INSURANCE COMPANY, and New York Life Annuity Corporation, Defendants.**

**No. CV 89–88–BLG–JFB.**

United States District Court, D. Montana, Billings Division.

March 5, 1991.

---

Steve Reida, Landoe, Brown, Planalp & Kommers, Bozeman, Mont., for plaintiffs.

Peter F. Habein, Crowley Law Firm, Billings, Mont., for defendant.

## MEMORANDUM OPINION AND ORDER

BATTIN, Senior District Judge.

Presently pending before the Court are (1) defendant New York Life Insurance Company's Motion for Summary Judgment; and (2) Plaintiffs' Motion to Compel. For the reasons stated below, the motions are granted and denied as follows.

I. Defendant's Motion for Summary Judgment

### FACTS AND PROCEDURAL BACKGROUND

Plaintiffs filed this action asserting various claims arising out of their purchase of several life insurance and annuity policies from defendant New York Life Insurance Company ("New York Life)".[1] Plaintiffs allege that Harold Schwan ("Schwan"), an agent of New York Life, (1) made misrepresentations to them concerning the rate of return and benefits, of the policies to induce their purchase in 1983; (2) made unauthorized policy purchases for them; (3) commingled the plaintiffs' policyholder payments with his personal funds; (4) forged an endorsement on a check payable to plaintiff Wilma Shupak in 1985 and converted the proceeds thereof; (5) misapplied a $20,000.00 payment made by plaintiff Wilma Shupak in 1985, and converted a portion of that payment to his own personal use; (6) changed plaintiff's address on company records from July, 1985 through August, 1986, so that plaintiffs would not receive notices regarding the status of their policies; and (7) failed to deliver purchased policies to them. Plaintiffs seek to hold New York Life vicariously liable for Schwan's acts, and also seek to hold New York Life directly liable, based upon its failure to investigate Schwan's handling of plaintiffs' policies and to implement an adequate management system to monitor the conduct of its agents or to otherwise protect plaintiffs. Specifically, plaintiffs assert claims for:

Count I: Negligent misrepresentation

Count II: Fraud and conversion

Count III: Montana Insurance Code violations

Count IV: Negligence and breach of fiduciary duty

Count V: Breach of the implied covenant of good faith and fair dealing

Count VI: Negligent infliction of emotional distress.

Defendant New York Life seeks summary judgment in its favor on statute of limitations grounds, and asserts other substantive defenses to plaintiffs' claims as well. The Court has carefully considered the briefs and supporting materials submitted by the parties, as well as the oral arguments of counsel. For the reasons stated below, defendant's motion is granted in part and denied in part.[2]

## DISCUSSION

Federal jurisdiction in this case is based upon diversity of citizenship under 28 U.S.C. § 1332. The substantive rights and obligations of the parties are therefore determined with reference to Montana law. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58

---

**1.** New York Life Annuity Corporation issued the annuity policies sold to plaintiffs by New York Life, and has been named as a defendant "as a precautionary measure to prevent New York Life Insurance Company from taking a hypertechnical position that it cannot be held responsible for wrongfully issued annuities." *See* Brief in Support of Motion to Amend Plaintiff's Complaint, pg. 2. Hereafter, "New York Life" or "defendant" refers only to New York Life Insurance Company, the moving party.

**2.** The facts of the case will be developed more fully in the context of later discussions of the issues raised by defendant's motion.

S.Ct. 817, 82 L.Ed. 1188 (1938); *Caesar Electronics, Inc. v. Andrews*, 905 F.2d 287, 289 n. 3 (9th Cir.1990).

 Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving party must initially identify those portions of the record before the Court which it believes establish an absence of material fact. *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir.1987). If the moving party adequately carries its burden, then the party opposing summary judgment must then "set forth specific, facts showing that there is a genuine issue for trial." *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103–04 (9th Cir.), *cert. denied*, 479 U.S. 949, 107 S.Ct. 435, 93 L.Ed.2d 384 (1986).

 All reasonable doubt as to the existence of genuine issues of material fact must be resolved against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Nevertheless, "[d]isputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Electrical Service*, 809 F.2d at 630 (citing *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510). "A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. The materiality of a fact is thus determined by the substantive law governing the claim or defense." *Id.*

 If a rational trier of fact might resolve disputes raised during summary judgment proceedings in favor of the nonmoving party, summary judgment must be denied. *Matsushita Electrical Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, the Court's ultimate inquiry is to determine whether the "specific facts" set forth by the nonmoving party, viewed along with the undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence. *Id.* at 631. If so, summary judgment must be denied. Having so stated, the Court now turns to the merits of the pending motion.

A. *Count I: Negligent Misrepresentation*

In Count I of their Amended Complaint and Demand for Jury Trial ("Amended Complaint"), plaintiffs allege that agent Schwan "negligently misrepresented all insurance products sold to Shupaks, by guaranteeing interest rate return (sic) of 11% or higher, stating that insurance policies and annuities are a better savings vehicle than a savings account, and misinforming Shupaks as to the amount of money necessary to prepay a life policy", knowing the representations were false. (Amended Complaint, Count I, para. 27.) Defendant seeks summary judgment in its favor on this claim, arguing that the claim is barred by the applicable statute of limitations.

A claim for negligent misrepresentation is governed by the two year statute of limitation found at Montana Code Annotated ("M.C.A.") § 27–2–203. *See R.H. Grover, Inc. v. Flynn Ins. Co.*, 238 Mont. 278, 286, 777 P.2d 338, 343 (1989) (citing *White v. Lobdell*, 208 Mont. 295, 306, 678 P.2d 637, 642 (1984)); *Falls Sand and Gravel Co. v. Western Concrete, Inc.*, 270 F.Supp. 495 (D.Mont.1967).

> "This limitation period begins to run when the plaintiff 'discovers' the misrepresentation. Section 27–2–203, MCA. Under *Mobley v. Hall*, (1983), 202 Mont. 227, 657 P.2d 604, 'discovery' occurs when the plaintiff acquires such facts as would reasonably prompt inquiry or action."

*Grover*, 777 P.2d at 343. Thus, if a party asserting negligent misrepresentation "has 'notice or information of circumstances which would put him on inquiry which if followed would lead to knowledge, or that the facts were presumptively within his knowledge, he will be deemed to have actual knowledge of the facts.'" *Holman v.*

*Hansen,* 237 Mont. 198, 202, 773 P.2d 1200, 1203 (1989) (citing *Mobley v. Hall,* 202 Mont. 227, 657 P.2d 604 (1983)). "The question of whether there has been a 'discovery' of facts sufficient to start the running of the statute of limitations is a question of law." *Id.* (citing *Mobley,* 657 P.2d at 607).

■ The original Complaint in this action was filed on May 16, 1989. Thus, applying a two-year limitation period, plaintiffs' claims are time-barred if plaintiffs had actual or inquiry notice of Schwan's negligent misrepresentations prior to May 16, 1987. The Court has carefully reviewed the Amended Complaint and the other materials before it, including the depositions of both Wilma and Thomas Shupak, in an attempt to determine the state of their knowledge during the relevant time frame. Having so done, the Court concludes that Count I of the Amended Complaint is time-barred.

Schwan's negligent misrepresentations are alleged by plaintiffs to have occurred in 1983. (Amended Complaint, paras. 5–9). This is when plaintiffs met Schwan, and when he sold them the policies in question. The record shows that plaintiffs were told by another New York Life agent in the fall of 1983 that Schwan had inaccurately represented the provisions of one of the policies sold to them. *See* Deposition of Jane May, pgs. 19–20. The record also reveals that as early as 1985, both Thomas and Wilma Shupak had doubts about the status of their insurance policies and the truth of the information which had been presented to them by Schwan. Deposition of Wilma Shupak ("W. Shupak depo."), pg. 79. In 1985, Thomas Shupak grew increasingly distrustful of Schwan, and was uncomfortable with Schwan's blithe reassurances given in response to his questions about their policies. Deposition of Thomas Shupak ("T. Shupak Depo."), pgs. 13–14.

By mid–1985, after Wilma Shupak had given $20,000.00 to Schwan to pay up two of their life insurance policies, Thomas Shupak's distrust for Schwan was such that he became angry at his wife for paying over the money to Schwan, and told her that Schwan "went south" with her money. W. Shupak depo., pg. 86.

To verify the benefits and cash value of the policies as represented by Schwan, Thomas Shupak asked his banker to assess the value of the policies for loan purposes in 1985. T. Shupak depo., pg. 14. In response to that inquiry, Thomas Shupak's banker told him that "there is no way you are going to get any $20,000.00 in seven years", as Schwan had represented to them. W. Shupak depo., pg. 77. The banker's remarks served to increase plaintiff Thomas Shupak's concern about the policies, and he began "hounding" New York Life for answers. W. Shupak depo., pg. 77; T. Shupak depo., pg. 12.

Plaintiffs did not receive satisfactory responses to their inquiries, and knew they "weren't getting a straight story" from Schwan. W. Shupak depo., pg. 76. 12. Schwan "beat around the bush" and avoided their questions. T. Shupak depo., pg. 17. According to Thomas Shupak, they knew they were not getting straight answers from Schwan, and "it was terrible"; they "just couldn't get nothing (sic) settled with him." *Id.,* at pg. 18.

Additionally, in 1985, Thomas Shupak began stopping by the New York Life office in Billings, to "get somebody to go over [his] policy" and help him figure out "what [he's] got and what [he hasn't] got." T. Shupak depo., pg. 27. Each time he stopped by, other agents told him they "[would] get back to [him]". *Id.* None of the other agents misled or lied to plaintiffs about their policies during those meetings. *Id.,* at pg. 32. No one at New York Life, including Schwan, responded to plaintiffs' inquiries in a meaningful way. By 1986, plaintiffs allege that they had asked New York Life to conduct an investigation into the status of their policies. Amended Complaint, Count IV, para. 54.

In May 1986, in response to Thomas Shupak's persistent questioning, Schwan wrote a check on his personal account in the amount of $1000.00, payable to Thomas Shupak. At that point, Thomas Shupak realized "there has got to be something

crooked going on now". T. Shupak depo., pgs. 18–20.

Finally, and very tellingly, both Tom and Wilma Shupak attribute Tom's ulcer condition in 1985, when he was treated by Drs. Thomaszewski and Marchello, to the financial losses and stress they were experiencing as a result of Schwan's wrongful conduct. T. Shupak depo., pgs. 41–44; W. Shupak depo., pgs. 181–182.

These facts, established by plaintiffs' depositions, clearly show that plaintiffs had "discovered" facts sufficient to start the running of the statute of limitations on their negligent misrepresentation claims possibly as early as 1985, and certainly by 1986. Had plaintiffs diligently acted upon their strong suspicions, they would have acquired actual knowledge of Schwan's misconduct at that time. This is true even though plaintiffs may not have had full knowledge of their cause of action or of the extent of their damages by that time. *Association of Unit Owners of Deer Lodge Condominium v. Big Sky of Montana, Inc.*, 245 Mont. 64, 798 P.2d 1018, 1032 (1990) (citing *Mobley v. Hall*, 202 Mont. 227, 657 P.2d 604 (1983); *E.W. v. D.C.H.*, 231 Mont. 481, 487, 754 P.2d 817, 820–21 (1988)).

Plaintiffs assert that they did in fact conduct diligent inquiry into the status of their policies, and that their efforts were hampered by Schwan's refusal to respond to their questions, and by reassurances given them by other New York Life agents. Essentially, plaintiffs argue that the running of the limitation period should be tolled, under the doctrine of fraudulent concealment. Fraudulent concealment consists of "the employment of artifice, planned to prevent inquiry or escape investigation, and mislead or hinder acquisition of information disclosing a cause of action." *E.W.*, 754 P.2d at 821 (quoting *Monroe v. Harper*, 164 Mont. 23, 28, 518 P.2d 788, 790 (1974)). To invoke this doctrine, plaintiffs must show "affirmative conduct by the defendant calculated to obscure the existence of the cause of action." *Holman*, 773 P.2d at 1203 (citing *Yellowstone Conference of United Methodist Church v. D.A. Davidson, Inc.*, 228 Mont. 288, 741 P.2d 794, 798 (1987)).

In this case, it is obvious that the evasive tactics and reassurances employed by Schwan in an attempt to deflect plaintiff's inquiries did not succeed in concealing his wrongdoing from plaintiffs. If anything, Schwan's evasive actions tended to exacerbate plaintiff's suspicions. Moreover, no evidence supports plaintiffs' contention that the other New York Life agents' responses to plaintiffs' inquiries were "calculated to obscure the existence of a cause of action" for the negligent misrepresentations made to plaintiffs when they purchased their policies. *Holman*, 773 P.2d at 1203. Instead, those agents simply failed to respond to the inquiries, or deferred any response to Schwan, who managed plaintiffs' policies. The other New York Life agents did not make any affirmative representations about the policies, according to Thomas Shupak, who actually met with those agents.[3] Their conduct therefore did not amount to fraudulent concealment of plaintiffs' cause of action for negligent misrepresentation. *See e.g., Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1416 (9th Cir.1987).

Although plaintiffs may not have known precisely how Schwan had injured them, the undisputed facts clearly establish that by 1985 they had strong suspicions about Schwan's dishonesty. By 1985, or 1986 at the latest, plaintiffs had "notice or information of circumstances which would put [them] on inquiry" notice, thereby commencing the running of the two-year stat-

---

3. Wilma Shupak states that on one occasion in 1986, another New York Life agent, Kelly Aldridge, reassured plaintiffs that the lapse notices they had been receiving were the result of computer error, and that they should not be concerned about the status of their policies. However, any such reassurance given regarding the lapse of a policy in 1986, and the reason therefor, has no bearing on plaintiffs' inquiry notice of misrepresentations made by Schwan in 1983 to induce the purchase of the policies. Moreover, after receiving the reassurance from Aldridge, the record suggests that plaintiffs were not, in fact, reassured; they still wanted to hear the same words from Schwan. *See* W. Shupak depo., pg. 94.

ute of limitations. *Holman*, 773 P.2d at 1203. Plaintiffs' negligent misrepresentation claim, filed on May 16, 1989, is therefore barred by the two-year statute of limitation of M.C.A. § 27–2–203. Summary judgment is properly granted in favor of defendants on Count I of plaintiff's Amended Complaint.

### B. *Count II: Fraud and Conversion*

Plaintiffs next allege that Schwan committed the torts of fraud and conversion by (1) forging Wilma Shupak's endorsement on a check for $10,000.00 issued by New York Life and converting the proceeds thereof; (2) converting $4,926.47 out of the $20,000.00 paid by Wilma Shupak to Schwan in May of 1985; and (3) by filing a change of address with New York Life to prevent plaintiffs from receiving policy information through the mail. Plaintiffs allege that New York Life, as principal, is liable for the tortious conduct of its agent, and they seek both compensatory and punitive damages.

At the outset, the Court finds that the factual allegations of Count II do not meet the elements of a cause of action for fraud. Plaintiffs do not allege a false, material representation by defendant or its agent, which was intended to and which was in fact reasonably relied upon by plaintiffs to their detriment. *See Lee v. Armstrong*, 244 Mont. 289, 798 P.2d 84, 87 (1990). Thus, the Court will construe Count II solely as a cause of action for conversion. Defendant seeks summary judgment in its favor on this Count, again based on the statute of limitations.

A conversion occurs when there is ownership of property, a right of possession, and unauthorized dominion over the property by another, resulting in damages. *Farmers State Bank v. Imperial Cattle Co.*, 218 Mont. 89, 708 P.2d 223, 227 (1985). The statute of limitation applicable to a cause of action for conversion is found at M.C.A. § 27–2–207(2), which provides for a limitation period of two years. The statute

of limitation for a conversion claim begins running when the cause of action accrues, Mont.Code Ann. § 27–2–102(2); however, the running of the period of limitation is postponed:

> "until the facts constituting the claim have been discovered or, in the exercise of due diligence, should have been discovered by the injured party if:
>
> (a) the facts constituting the claim are by their nature concealed or self concealing; or
>
> (b) before, during or after the act causing the injury, the defendant has taken action which prevents the injured party from discovering the injury or its cause."

Mont.Code Ann. § 27–2–102(3)(a), (b).

In this case, the alleged claims for conversion accrued (1) when Schwan forged an endorsement and obtained the proceeds of a check written payable to Wilma Shupak, and (2) when Schwan exercised unauthorized dominion over a portion of the $20,000 paid by Wilma Shupak in May of 1985, since that is when the injuries occurred.[4] *E.W.*, 754 P.2d at 821 (citing *Blasdel v. Montana Power Co.*, 196 Mont. 417, 640 P.2d 889 (1982); *Heckaman v. Northern Pacific Railway Co.*, 93 Mont. 363, 20 P.2d 258 (1933)). With respect to the allegation of forgery, the Court finds that the facts constituting the forgery were, by their nature, concealed from plaintiffs. There is no evidence from which the Court may conclude that plaintiffs, with the exercise of due diligence, could have discovered the forgery by Schwan, regardless of when it occurred. Thus, the running of the statute of limitation was tolled until such time as the plaintiffs gained knowledge of or, with the exercise of due diligence, could have discovered the facts constituting the injury.

The record reveals that neither plaintiffs, nor defendant, for that matter, became actually or constructively aware of the alleged forgery until 1988. *See* Deposition of Jane May, p. 102. The conversion claim

---

**4.** The alleged change of address by Schwan does not constitute conversion of property, and summary judgment is properly granted in favor of defendant to the extent that a conversion claim rests upon that allegation.

based upon that misconduct, filed in May 1989, was well within the two-year limitation period of § 27–2–207, M.C.A.

■ A different result obtains, however, with regard to Schwan's alleged conversion of a portion of the $20,000.00 paid by Wilma Shupak in May of 1985. As noted above in the context of plaintiffs' claim for negligent misrepresentation, plaintiffs were suspicious of foul play with respect to the $20,000.00 as early as 1985, notwithstanding the change of address by Schwan in August, 1985. Their suspicions persisted as they continually received no meaningful responses to their inquiries, including a request for a breakdown of where the $20,000.00 went. *See* W. Shupak depo., pg. 76–79. At one point in 1985, Thomas Shupak told his wife that Schwan "went south" with her $20,000.00. *Id.*, pg. 86. With the exercise of due diligence in following up their suspicions, plaintiffs could have discovered how Schwan had utilized those funds, and therefore could have discovered the occurrence of the conversion and their injury. *See* § 27–2–102(3), M.C.A. Instead, they accepted general reassurances from a man they already had reason to distrust.

There is no evidence to show that other New York Life agents knew of plaintiffs' concerns about the $20,000.00 given to Schwan by Wilma Shupak, until New York Life agent Jane May learned of them in late 1987. *See* Deposition of Jane May, p. 63. The actions of the other agents therefore could not have been "calculated to obscure" the existence of plaintiffs' conversion cause of action. *See e.g., Holman,* 773 P.2d at 1203. In the absence of such fraudulent concealment, the statute of limitation began running on this claim for conversion in 1985, and the action filed in May 1989 with respect to those funds is time-barred.

C. *Count III: Montana Insurance Code Violations*

In Count III of their Amended Complaint, plaintiffs allege violations of various Montana statutes, specifically Sections 33–17–202, 33–17–1102, 33–18–204, 33–18–212,

33–18–201(4) and 33–18–201(6), M.C.A. Defendants challenge plaintiffs' claims under Montana statutory law, arguing that those particular sections of the Montana Code are enforceable only by the Montana Insurance Commissioner and not by a private right of action. Plaintiffs have conceded that the claims under §§ 33–17–202 and 33–18–201 are improperly brought. The Court will therefore direct its attention to the remaining sections.

The statutes at issue here are part of a statutory scheme enacted by the Montana Legislature in 1959. That legislation was based upon " 'model' laws designed under the auspices of the National Association of Insurance Commissioners ...". R. Williams, *Montana's Comprehensive New Insurance Law,* 22 Mont.Law Rev. 1, 9 (1960). Similar legislation has been adopted in 48 states. *Moradi–Shalal v. Fireman's Fund Insurance Companies,* 46 Cal.3d 287, 250 Cal.Rptr. 116, 121, 758 P.2d 58, 63 (1988). Of those states who have adopted the model Insurance Code in some form or another, the vast majority have declined to imply a private remedy for its violation. *Id.,* 250 Cal.Rptr. at 121–123, 758 P.2d at 63–64. In fact, the California Supreme Court recently overruled a prior decision, *Royal Globe Insurance Co. v. Superior Court,* 23 Cal.3d 880, 153 Cal. Rptr. 842, 592 P.2d 329 (1979), wherein it had found that such a private right of action existed. *See id.; see also Tricor California, Inc. v. Superior Court,* 220 Cal.App.3d 880, 269 Cal.Rptr. 642 (Cal.App. 1990). Moreover, the National Association of Insurance Commissioners has reiterated that "[t]he 1971 Model Act does not contain an individual right of action provision". *Moradi–Shalal,* 250 Cal.Rptr. at 123, 758 P.2d at 65 (citing 2 N.A.I.C. Proceedings (1980) 345–346). With this background in mind, the Court turns its attention to the particular sections relied upon by plaintiffs.

1. *Section 33–17–1102*

■ Section 33–17–1102, M.C.A., is part of the statutory scheme regulating the licensing and appointment of insurance producers and solicitors in Montana, and spe-

cifically addresses the reporting and accounting of premiums received by an agent or solicitor. Plaintiffs assert that this section was designed to protect the public, and that it is "ludicrous to suggest that [it] can be violated at will by an agent with no legal consequences." Plaintiffs' Response Brief to Defendant's Motion for Summary Judgment, pg. 14. After careful consideration of the issue, the Court agrees in principle with plaintiffs' contentions, but nevertheless declines to imply a private right of action under § 33–17–1102.

The self-proclaimed purpose of Title 33, Chapter 17 is "to govern the qualifications and procedures for licensing insurance producers". Mont.Code Ann. § 33–17–101(1). Based on this express statement of legislative purpose, the Court initially finds that § 33–17–1102 is properly viewed as a licensing statute, setting forth a statement of the conduct which is required if a licensee wishes to retain his or her license under the statutory scheme. While furtherance of the public interest was without question a consideration underlying the enactment of that section, it was not designed or intended to provide direct public protection.

This conclusion is bolstered by the fact that § 33–17–1001(1)(d) provides, as the sole remedy for its violation, that the commissioner may suspend, revoke, or refuse to continue a license where a licensee has "[misappropriated] or [converted] to his own use or [illegally withheld] moneys or property belonging to policyholders, insurers, beneficiaries, or others and received in the conduct of the business under the license ...". Mont.Code Ann. § 33–17–1001(1)(d). There is, however, no express legislative provision for a private right of action under this section, as is evidenced in other sections of the Montana Code pertaining to insurance. *See, e.g.,* Mont.Code Ann. § 33–18–242; *see also Hopkins v. Allstate Insurance Co.,* CV 89–014–GF (D.Mont. July 27 1989), *aff'd.,* 909 F.2d

1489 (9th Cir.1990). Nor is there any other clear authority implying a private right of action under this statute. For those reasons, the Court concludes that defendant is entitled to summary judgment on plaintiffs' claim under § 33–17–1102 M.C.A.

### 2. *Sections 33–18–204 and 33–18–212*

Sections 33–18–204 and 33–18–212 are set forth in the chapter of the Montana Code dealing with unfair trade practices by those in the insurance business. The overall purpose of these statutes is:

> "to regulate trade practices in the business of insurance ..., by defining or providing for determination of all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined."

Mont.Code Ann. § 33–18–101. Part 2 of Title 33, Chapter 18, governs the relationship between an insurer and an insured. Other than allowing an independent cause of action for an insured or a third-party claimant under certain subsections of § 33–18–201, *see* Mont.Code Ann. § 33–18–242; *Klaudt v. Flink,* 202 Mont. 247, 658 P.2d 1065 (1983),[5] neither the Montana Legislature nor the courts has expressly granted a private right of action under the provisions of Chapter 18, Title 33. The Legislature has, however, granted broad powers of enforcement to the Montana Insurance Commissioner. *See* Mont.Code Ann. § 33–18–1001, *et seq.* In light of the clear delineation by the Montana Legislature of those few provisions of Chapter 18 that will support an independent cause of action by an insured or a third-party claimant, and in the absence of any indication that the Legislature intended other sections to do so, this Court finds that §§ 33–18–204 and 33–18–212 do not give rise to a private right of action. Defendants are entitled to summary judgment on Count III as well.

---

**5.** Plaintiffs originally asserted claims under M.C.A. § 33–18–201(4) and (6), which address the investigation and settlement obligations of insurers with respect to claims made under an insurance policy. Plaintiffs later waived those

claims, recognizing that they were not viable in the absence of a "specific 'claim' under an insurance policy for benefits". Plaintiffs' Response Brief to Defendant's Motion for Summary Judgment, pg. 16.

Having so concluded, the Court need not address the statute of limitation arguments raised by defendant with respect to these statutory claims.[6]

### D. Count IV: Negligence and Breach of Fiduciary Duty

Next, plaintiffs assert tort claims for negligence and breach of fiduciary duty, based on the theory of *respondeat superior* and also upon allegations of breaches of various legal duties owed directly to plaintiffs by defendant. Plaintiffs seek only compensatory damages with respect to these claims. Defendant again seeks summary judgment in its favor on statute of limitation grounds.

■■ The statute of limitation period for the negligence and breach of fiduciary duty claims is three years. Mont.Code Ann. § 27-2-204. As with the claim of conversion, the statutory period begins to run when the causes of action accrue; however, again, the running of the limitation period is tolled:

> "until the facts constituting the claim have been discovered or, in the exercise of due diligence, should have been discovered by the injured party if:
>
> (a) the facts constituting the claim are by their nature concealed or self concealing; or
>
> (b) before, during or after the act causing the injury, the defendant has taken action which prevents the injured party from discovering the injury or its cause."

Mont.Code Ann. § 27-2-102(3)(a), (b). Thus, those claims accruing prior to May 16, 1986 are time-barred, unless the running of the limitation period was postponed under the provisions of M.C.A. § 27-2-102(3).

Plaintiffs' claims of negligence and breach of fiduciary duty are based upon:

(1) New York Life's alleged failure "to provide trained, competent and honest agents to solicit life insurance applications";

(2) New York Life's alleged failure "to act reasonably and supervise the conduct of its agents", including a failure to prevent Schwan's commingling of personal and business funds;

(3) New York Life's alleged failure "to implement guidelines and procedures which would have protected Shupaks from the fraud and misrepresentations committed against them by Harold Schwan ... [including] verifying delivery of policies, auditing an agent's files on a regular basis, and supervising the job performance of all of it's (sic) agents";

(4) New York Life's alleged failure to undertake an investigation of Schwan's activities in 1986, although requested by plaintiffs to do so;

(5) Harold Schwan's alleged conduct in allowing a policy to lapse, and failing to deliver two other policies, one of which was purchased in September, 1983 and the other in 1985.[7]

The Court now turns to discussion of each of the grounds asserted.

#### 1. Claims based on alleged managerial deficiencies

With respect to the first three grounds for plaintiffs' claims of negligence and breach of fiduciary duty, the Court finds that the supervisory and managerial duties asserted by plaintiffs necessarily existed at the inception of the relationship between the parties.[8] Any breaches of those duties also occurred at the inception of the relationship. Simply put, if defendant's company policies governing the qualification, su-

---

6. Although plaintiffs have argued defendant's violation of § 33-18-210 M.C.A., in addition to the statutory provisions referenced above, plaintiffs did not plead that section in their Amended Complaint. The Court therefore declines to address the merits of a claim under that section, except to note that it would be subject to the same analysis as other sections of Chapter 18, Title 33.

7. The second policy was an annuity policy which plaintiffs allege was purchased without their authorization or knowledge in 1985, out of the proceeds of the $20,000.00 given to Schwan by Wilma Shupak in May, 1985.

8. For purposes of this discussion, the Court assumes without deciding that the legal duties asserted by plaintiffs did in fact exist.

pervision and monitoring of its agents were so deficient that they constituted a breach of a legal duty owed to plaintiffs, then they were so at all times relevant to this case. However, a cause of action did not accrue, and the statute of limitation begin to run, until the plaintiffs sustained injury as a result of the alleged deficiencies. Mont. Code Ann. § 27–2–102(1)(a), (2).

▪ The record shows that plaintiffs were injured as a result of New York Life's alleged policy and supervisory failures in 1983, when plaintiffs purchased the policies in question in reliance upon Schwan's misrepresentations. Construing the facts in favor of plaintiffs, Schwan's misrepresentations resulted from his incompetence or dishonesty. Had defendant properly trained and supervised Schwan, and had defendant implemented guidelines and procedures to prevent fraud and misrepresentations, such conduct presumably would not have occurred. Moreover, in 1983 Schwan used his personal funds to make premium payments on plaintiffs' behalf to induce the purchase of a policy, Amended Complaint, para. 10, and failed to deliver at least one policy to them. *Compare* Amended Complaint, para. 9, *with* para. 58. None of this conduct would have occurred had New York Life met the duties which plaintiffs seek to impose upon it. Plaintiffs were therefore injured by defendant's alleged lack of sound management practices in 1983. Plaintiffs' causes of action for negligence and breach of fiduciary duty were complete at that time and the three-year limitation period began to run in 1983. "The fact that a person entitled to an action has no knowledge of his right to sue, or of the facts out of which his right arises, does not, as a general rule, prevent the running of the statute, or postpone the commencement of the period of limitation, until he discovers the facts or learns of his right thereunder." *Kerrigan v. O'Meara,* 71 Mont. 1, 8, 227 P. 819, 822 (1924); *see also Bennett v. Dow Chemical Co.,* 220 Mont. 117, 713 P.2d 992 (1986); *Carlson v. Ray Geophysical Division,* 156 Mont. 450, 481 P.2d 327 (1971). Nor does the fact that other consequential damages occurred later toll the running of the limitation period. *See Engine Rebuilders, Inc. v. Seven Seas Import–Export & Merc.,* 189 Mont. 236, 615 P.2d 871, 873 (1980).

▪ Moreover, even assuming that the running of the limitation period was somehow postponed under § 27–2–102(3),[9] plaintiffs were on inquiry notice of defendant's alleged negligence as early as 1985. By that point, as previously discussed, they certainly had reason to believe that Schwan was not a "trained, competent and honest" agent. *See supra,* pgs. 6–9. Plaintiffs also had inquiry notice of Schwan's misapplication of Wilma Shupak's $20,000.00, by commingling or conversion. *See supra,* pgs. 14–15. These facts and others put plaintiffs on notice of defendant's alleged negligence in training, supervising and monitoring its agents, whether or not plaintiffs had actual notice of the legal actions available to them. *Bennett,* 713 P.2d at 994–95.

Had plaintiffs diligently pursued their suspicions in a reasonable fashion, in 1985, if not in 1983, they would have gained knowledge of the extent of Schwan's misdeeds, as well as New York Life's failure to prevent or remedy them. Instead, plaintiffs, after receiving no satisfactory answers from Schwan or New York Life in response to their repeated inquiries in 1985, delayed the filing of any legal action until May of 1989, all the while harboring suspicions and distrust about Harold Schwan and his activities. "The law does not contemplate such discovery as would give complete knowledge before the cause of action accrues ... Rather the discovery doctrine only tolls the running of the statutory clock until such time as the plaintiff, in the exercise of reasonable care and diligence, should have been aware of the wrongful act and the injury." *Deer Lodge Condominiums,* 798 P.2d at 1018 (citations omitted). Plaintiffs' filed their first three

9. This is questionable, since Schwan's use of personal funds to pay premiums and his failure to deliver policies was by no means concealed from plaintiffs, so as to toll the running of the limitation period under M.C.A. § 27–2–102(3).

claims for negligence outside the three-year limitation period of M.C.A. § 27-2-204, and those claims are time-barred.

In so concluding, the Court certainly does not in any manner condone either the tactics employed by Schwan, or any New York Life practice or policy of purposeful ignorance to the acts of its agents, if indeed such a deliberate practice or policy existed. Nevertheless, the Court is obligated to enforce the statutes of limitation, as designed by the Montana Legislature "to compel the exercise of a right of action within a reasonable time," while the evidence is available and fresh.[10] *See E.W. v. D.C.H.*, 754 P.2d at 818–819, 820.

### 2. *Claim based on lapsed policy*

■ Turning to plaintiffs' negligence claim based on vicarious liability for Schwan's actions in allowing policy No. 37-849-128 to lapse, the Court first finds that although plaintiffs did not receive a lapse notice until September, 1987, the cause of action accrued when the injury first occurred, namely when Schwan failed to pay the policy in full in 1985, pursuant to Wilma Shupak's instruction. That is when the statute of limitation began to run on this claim, whether or not plaintiffs had knowledge of the claim or its accrual. Mont. Code Ann. § 27-2-102(1)(a), (2).

■ Plaintiffs assert that the running of the limitation period was tolled because Schwan took the affirmative step of changing plaintiffs' address on New York Life records in August 1985, thereby preventing them from receiving notices in the mail reflecting the status of their policies, arguably in an attempt to conceal from them the fact of their injury. Nevertheless, as previously noted, Schwan's conduct did not serve to postpone the running of the limitation period under § 27-2-102(3), since plaintiffs already had inquiry notice in 1985 that the policy had not been paid up.

Plaintiffs suspected that there was a problem with the $20,000.00 given to Schwan by Wilma Shupak, shortly after May, 1985. Their suspicions were suffi-ciently strong in 1985 that Thomas Shupak told his wife that Schwan "went south" with her money, and he began "hounding" Schwan and other New York Life agents for information about their policies. They knew that Schwan was not being straight-forward with them, and that their inquiries of other agents were not responded to in a satisfactory manner. Those actions, rather than lulling plaintiffs into a sense of security, served only to further frustrate them. Rather than diligently pursue their suspicions, "Tom ... kind of let everything just go for a while". W. Shupak depo., pg. 90. Had plaintiffs persisted in their inquiry into the status of their policies and the fate of the $20,000.00, they would have discovered that Schwan had not paid up policy No. 37-849-128, as instructed. Thus, plaintiffs are deemed to have had knowledge of that injury as early as 1985. *See e.g., Holman*, 773 P.2d at 1203.

■ Plaintiffs also contend, however, that they were reassured by New York Life agents in August, 1986, that the lapse notices they had been receiving were the result of a computer error, and that they should not worry about the status of their policy. W. Shupak depo., pgs. 90, 94, 96. These affirmative statements, one of which was made by Schwan, went to the heart of the cause of action for negligence resulting from Schwan's failure to pay up the policy, and would conceal the existence of the cause of action from plaintiffs, thereby tolling the running of the statute of limitation at that time. Mont.Code Ann. § 27-2-102(3)(b). However, when plaintiffs received another lapse notice on September 1, 1987, *see* Amended Complaint, para. 16, they were again on notice of problems with their policy, and the running of the limitation period resumed. Thus, the running of the limitation period was tolled for approximately one (1) year.

As previously noted, the statute of limitation began running on this claim in May, 1985, shortly after Wilma Shupak wrote the check for $20,000.00 and Schwan failed to pay up policy No. 37-849-128, as instructed. The present complaint was filed

**10.** Harold Schwan, obviously a prime player in this case, died in March, 1988.

on May 16, 1989, approximately 4 years later. Subtracting the one year during which the running of the limitation period was tolled establishes that the original Complaint herein was filed approximately three years after the injury occurred. Given the uncertainty as to the exact dates on which the relevant events occurred, the Court finds that it would be inequitable to bar this claim on statute of limitation grounds, and that defendant has failed to establish its entitlement to summary judgment on this claim.

A different result is compelled, however, with respect to the nondelivery of annuity policy No. NP 457–206. While it is true that plaintiffs had no actual knowledge of the existence of this policy in 1985, they were on inquiry notice of its existence and nondelivery in 1985. Diligent inquiry into Schwan's application of the $20,000.00 would have revealed those facts. The general reassurances given to plaintiffs by Schwan did not serve to postpone the running of the statute, since it is evident that Schwan's reassurances did not conceal the existence of the claim, but instead only fueled plaintiffs' frustration and suspicions. Nor is there evidence to support a finding that the other agents who were approached by plaintiffs between 1985 and 1987 knew of the $20,000.00 and made any affirmative statement regarding the policies, other than to tell plaintiffs that someone (usually Schwan) would get back to them. T. Shupak depo., pgs. 27, 32. Plaintiffs' failure to diligently pursue their suspicions is fatal to this claim.

Next, with regard to the nondelivery of policy No. NP 133–602, the Court notes that the policy was purchased in 1983. Amended Complaint, para. 9. There were no actions by New York Life or its agents to conceal the fact of its alleged nondelivery. The three-year limitation period therefore began to run on this claim in 1983. Plaintiffs' failure to assert their claim before May 16, 1986, within the three year limitation period, renders the negligence claim untimely.

The only other seasonable negligence claim asserted by plaintiffs concerns the specifically alleged failure of New York Life to conduct an investigation into Schwan's activities and the status of their policies in September, 1986, when plaintiffs claim that they requested that one be done. By allowing this claim to proceed, the Court expresses no opinion as to the merits of the claim, either in terms of the legal duty imposed or the factual question of its breach by defendant.

### E. *Count V: Bad faith*

Plaintiffs' claims of bad faith are based upon (1) Harold Schwan's alleged misrepresentations to plaintiffs; (2) New York Life's alleged failure "to investigate Shupak's complaints until after the death of Harold Schwan"; and (3) New York Life's alleged failure "to implement and enforce guidelines regarding delivery of policies, intermingling of funds, waste of policyholders' investment through lapse of older policies to purchase new policies, and twisting". Amended Complaint, Count V, para. 63–65.

The Court initially questions whether the theory of breach of an implied covenant of good faith and fair dealing is applicable to this case. While it is true that under Montana law a covenant of good faith and fair dealing is implied into every contract, *see Story v. City of Bozeman,* 242 Mont. 436, 791 P.2d 767, 775 (1990), the claims asserted herein do not implicate the insurance contracts between the parties; they focus instead upon peripheral aspects of the relationship between the parties. Without some attempt by one party to "[use] discretion conferred by the contract to act dishonestly or to act outside the accepted commercial practices to deprive the other party of the benefit of the contract", it is questionable whether any breach of the covenant occurred, even if the conduct alleged amounts to breaches of other common law obligations. *Id.*

Moreover, in light of the *Story* decision, the court questions whether these claims sound in tort or in contract, for purposes of determining the type of damages recoverable by plaintiffs and the applicable statute

of limitation. The Court desires further briefing on these issues, and will reserve ruling on the statute of limitation question on the bad faith claims until such briefing is completed and considered by the Court.

### F. *Count VI: Negligent Infliction of Emotional Distress*

At Count VI of their Amended Complaint, plaintiffs allege that defendant is liable for the independent tort of negligent infliction of emotional distress, based upon the activities of its agent, Harold Schwan. Plaintiffs allege that they have suffered "extreme embarrassment, anger, and frustration due to losses caused by New York Life and Harold Schwan. The fear of an early death of Thomas Shupak, with no life insurance protection, causes extreme worry by all members of the Shupak family." Amended Complaint, Count VI, para. 70.

 The Montana Supreme Court has construed the independent tort of negligent infliction of emotional distress very narrowly, thus far limiting its application to situations involving an emotional impact resulting from direct observance of the death or serious injury of a close relative. *Day v. Montana Power Co.*, 242 Mont. 195, 789 P.2d 1224, 1226 (1990); *Shiplet v. First Sec. Bank of Livingston, Inc.*, 234 Mont. 166, 174, 762 P.2d 242, 247 (1988) (both citing *Versland v. Caron Transport*, 206 Mont. 313, 322–23, 671 P.2d 583, 588 (1983). As in *Shiplet* and *Day*, that situation is not present here. The Montana Supreme Court has not yet recognized a cause of action for intentional infliction of emotional distress. *Day*, 789 P.2d at 1227.

> "Emotional distress under Montana law has been and remains primarily an element of damages rather than a distinct cause of action."

*Id.* (citing *Frigon v. Morrison–Maierle, Inc.*, 233 Mont. 113, 123, 760 P.2d 57, 63 (1988)). Whether or not plaintiffs can establish a physical injury, or a "substantial invasion of a legally protected interest"

causing a "significant impact upon the person of plaintiff", so as to warrant the recovery of compensatory damages for emotional distress, will remain to be seen at the time of trial. *Id.* 789 P.2d at 1226 (quoting *Johnson v. Supersave Markets, Inc.*, 211 Mont. 465, 473, 686 P.2d 209, 213 (1984). In any event, defendant's motion for summary judgment on plaintiff's independent cause of action for negligent infliction of emotional distress is properly granted.

### G. *Punitive Damages*

Plaintiffs also seek an award of punitive damages against defendant on several of their claims, including those set forth at Counts II (conversion) and V (bad faith) of the Amended Complaint. Because some of those claims have survived defendant's motion for summary judgment, the court will proceed to address defendant's contention that it may not be held liable for punitive damages in this case, based on the conduct of its agent, Harold Schwan.

Assuming that plaintiffs are able to establish the alleged wrongdoing by agent Schwan, and assuming that they are also able to establish defendant's vicarious liability for those acts, the next question becomes whether they may recover punitive damages from defendant, in addition to compensatory damages, based upon Schwan's conduct. Under Montana law, an award of punitive damages is properly awarded "where the defendant has been guilty of actual fraud or actual malice". Mont.Code Ann. § 27–1–221. Neither the statute itself, nor any Montana case law of which this Court is aware, has discussed whether the fraud or malice of an agent, imputed to a principal, is a sufficient basis for an award of punitive damages.[11] Because the Montana Supreme Court has not addressed this issue, this Court is obligated to attempt to predict how it would rule if faced with the same issue, and rule accordingly. *In re Kirkland*, 915 F.2d 1236, 1238–39 (9th Cir.1990) (citing *Molsbergen v.*

---

**11.** A sister division of this Court has, however, refused to impose vicarious liability for punitive damages in a different setting, by precluding recovery of punitive damages from a defendant corporation based on the wrongful acts of its corporate predecessor. *See Bowen v. W.R. Grace & Co.*, 781 F.Supp. 682 (D.Mont.1991).

*United States,* 757 F.2d 1016, 1020 (9th Cir.1985)).

The purpose of punitive damages is "to punish and deter the party found liable". *Ward v. Vibrasonic Laboratories, Inc.,* 236 Mont. 314, 769 P.2d 1229, 1234 (1989). An increasing number of jurisdictions are recognizing that this purpose is not served by imposing vicarious liability upon a principal for punitive damages, absent some showing of fault on the part of the principal. Those jurisdictions have, for the most part, adopted the test set forth in the Restatement (Second) of Torts, § 909, in determining when punitive damages may properly be awarded against a principal because of an agent's acts. *See Campen v. Stone,* 635 P.2d 1121, 1125 (Wyo.1981); *Agarwal v. Johnson,* 25 Cal.3d 932, 160 Cal.Rptr. 141, 603 P.2d 58, 69 (1979); *Protectus Alpha Nav. Co. v. North Pacific Grain Growers, Inc.,* 767 F.2d 1379, 1386 (9th Cir.1985) and cases cited therein. Section 909 provides as follows:

> Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,
>
> (a) the principal or a managerial agent authorized the doing and the manner of the act;
>
> (b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or
>
> (c) the agent was employed in a managerial capacity and was acting in the scope of employment;
>
> (d) the principal or a managerial agent of the principal ratified or approved the act.

Restatement (Second) of Torts, § 909 (1977).[12] Each of the subsections of § 909 require conduct on the part of the principal which contributed to or condoned the agent's commission of the wrong, and for which punishment or deterrence may justifiably be sought.

While the Montana Supreme Court has not yet adopted that section, it is harmonious with the above-stated purpose of punitive damages in Montana, and consistent with the language of the punitive damage statute, which allows an award of punitive damages where "the defendant has been guilty of actual fraud or actual malice." Mont.Code Ann. § 27–1–221 (emphasis added). At the same time, this standard appropriately precludes the imposition of punitive damages upon an innocent principal who is ignorant of its agent's wrongdoing. This Court believes that the Montana Supreme Court would follow the recent trend by adopting the standards set forth in § 909.[13]

Applying those standards to the facts of the present case, the Court finds that there is no evidence to support a finding of liability under subsections (a) or (c) of § 909. Nor is there any evidence to support a finding under subsection (d). New York Life never ratified, authorized or approved Schwan's acts. Nor was Schwan employed in a managerial capacity. While plaintiffs argue that defendant did ratify Schwan's conduct since it accepted premium payments on plaintiffs' policies, thereby benefitting from his conduct, the acceptance of benefits alone does not constitute ratification. *See Safeco Ins. Co. v. Lovely Agency,* 200 Mont. 447, 453, 652 P.2d 1160, 1163 (1982). Plaintiff must also show that defendant accepted the benefits with full knowledge of Schwan's conduct, and intended to ratify his action. *Id.* The evidence simply does not support such an inference or finding. *See e.g., Protectus Alpha,* 767 F.2d at 1387 (absent clear articulation of a company policy, corporate authorization or ratification of egregious acts is hard to establish).

The only subsection of § 217C that may be applicable to the facts of this case is subsection (b). To prevail under that subsection, plaintiffs must show that

---

**12.** This test is the same as that set forth at the Restatement (Second) of Agency, § 217C.

**13.** Moreover, the Ninth Circuit has stated that "in the absence of a ruling from the Montana Supreme Court, this Court will adopt the Re-

statement (Second) of Torts in cases arising in Montana." *Canada v. Blain's Helicopters, Inc.,* 831 F.2d 920, 923 (9th Cir.1987) (citing *Jackson v. Coast Paint and Lacquer Co.,* 499 F.2d 809, 811 (9th Cir.1974)).

Schwan was unfit and that New York Life was reckless in employing or retaining him. At the heart of this issue is the question of whether defendant had notice of Schwan's activities, such that it demonstrated recklessness in employing or retaining him. Plaintiff has set forth sufficient facts to create a jury question on that issue. Defendant's motion for summary judgment on the issue of punitive damages is therefore properly denied.

### H. *Dismissal of Steven Shupak's Claims*

Finally, defendant seeks dismissal of the claims asserted by Steven Shupak, arguing that he has no interest in any of the insurance policies in question, has suffered no injury, and had no contact with New York Life or its agents. Plaintiffs oppose dismissal, contending that Steven Shupak's status as a second beneficiary under his parents' policies, and as the named insured under a policy owned by his parents, confers a sufficient interest in the action to warrant his inclusion as a party plaintiff. The interest in his parents' policies, according to plaintiff, consists of the expectancy "that each policy would be prepaid in full as a result of $20,000.00 tendered to Schwan in 1985. As a result of Schwan's misrepresentations and theft of funds, the policies were not prepaid and lapsed. Steve's beneficiary interest was lost as a direct result of Schwan's conduct." Plaintiff's Response Brief to Defendants' Motion for Summary Judgment, pg. 26. With respect to the policy on which he was a named insured, plaintiff contends that he has been damaged by the loss of a "premium savings" on the policy, and the loss "of the sense of security that $25,000 would be paid to his parents in the event of his death". *Id.*, at pg. 27.

Looking first at the allegations of the Amended Complaint, the Court notes that the only claims asserted by plaintiffs that have survived the defendant's motion for summary judgment are: (1) the conversion claim at Count II, regarding Schwan's alleged conversion of a portion of Wilma Shupak's $20,000.00; (2) the negligence claims at Count IV, regarding the lapse of policy No. 37–849–128, and New York Life's failure to conduct an investigation when requested to do so in 1986; and (3) depending on the outcome of further briefing, the claims for breach of an implied covenant of good faith and fair dealing.

With respect to the conversion claim, the Court finds that dismissal is proper insofar as that claim relates to Steven Shupak, since he readily admits that he did not pay any premiums on the policies or own any of the funds allegedly converted, and therefore has no interest in the assertion of that claim. Deposition of Steven Shupak (S. Shupak depo.) pg. 20.

Turning next to plaintiffs' claims of negligence and bad faith arising out of the lapse of policy No. 37–849–128 and defendant's alleged failure to conduct an investigation in 1986, the Court will deny defendant's motion for summary judgment on those issues at this time. After reviewing the briefs on file, the Court is not persuaded that the duties asserted by plaintiffs do not exist in favor of a beneficiary or insured under circumstances such as those present herein. Furthermore, the Court is not satisfied that plaintiff Steven Shupak has failed to state a proper claim for damages. Should defendant wish to pursue those matters further, it is free to do so by renewing its motion, along with a brief addressing in greater detail the rights and obligations of the parties in light of the specific claims made and the specific damages sought in this case.

## II. Plaintiff's Motion to Compel

Plaintiffs have filed a motion, pursuant to Rule 37(a), Fed.R.Civ.P., for an order compelling defendant to respond to plaintiffs' Request for Production No. 9, dated August 10, 1989. That request is phrased as follows:

"Please produce all documents relating to communications between Defendant and the Montana Insurance Department regarding each investigation by the Montana Insurance Department of Harold Schwan undertaken in the past 10 years."

Defendant responded by referring plaintiff to certain correspondence provided in response to another request, and by objecting on the grounds that the request was (1) overbroad, since the term "relating to" is somewhat ambiguous and the request, as phrased, could encompass privileged or work product materials; (2) irrelevant, to the extent that the investigations in question occurred after Harold Schwan's death, and have no bearing upon issues in the pending action; and (3) would violate the privacy of complaining policyholders. As a compromise, defendant offered to provide plaintiffs with copies of written complaints filed with the Montana Insurance Commissioner before January 1988, redacting the policyholders' names and addresses to ensure their privacy.

Plaintiffs, on the other hand, argue that evidence of other complaints concerning agent Schwan is relevant to establish New York Life's knowledge of Schwan's widespread wrongful activities. Plaintiffs further argue that such evidence is admissible as evidence of a "general business practice", for purposes of proving their claims under M.C.A. § 33–18–201, M.C.A.

As previously noted, plaintiff has no viable claim under § 33–18–201, M.C.A. That statute therefore provides no basis for discovery of the matters sought. *See* discussion, *supra*, pg. 15.

Information concerning investigations by the Montana Insurance Department regarding agent Schwan would, however, be discoverable as bearing on defendant's notice of Schwan's activities, *provided that the complaints preceded New York Life's investigation into his wrongdoing.* It is undisputed that once New York Life began its own investigation in late 1987 or early 1988, it was on notice of Schwan's wrongdoing. Any complaints arising after that time would have no bearing on the state of New York Life's knowledge at the time of the events complained of herein.

Nor are the names and other identifying facts about the complaining policyholders relevant to determining the issue of notice. While making no ruling regarding the applicability of §§ 33–19–101 et seq. or 33–18–234, M.C.A., to the present situation, the Court does recognize and respect the general right to privacy afforded Montana citizens by the Montana Constitution. Mont. Const. art. II, § 10.

With those considerations in mind, the Court finds that the response which defendant has indicated it would be willing to make is reasonable, and will provide the plaintiffs with the information needed to establish defendant's notice of Schwan's conduct based on complaints to the Montana Insurance Commissioner. Accordingly, the Court will direct defendant to provide plaintiffs with copies of all complaints filed with the Montana Insurance Commissioner by New York Life policyholders prior to January, 1988 concerning New York Life agent Harold Schwan, provided that defendant shall redact the names and addresses of the complaining policyholders, to protect their privacy.

### III. Conclusion

None of the parties to this action seem to dispute that the plaintiffs herein were victimized by the tortious conduct of Harold Schwan, an agent of New York Life in its Billings Office. The Court understands the demoralizing and financially difficult impact which Schwan's conduct has had upon plaintiffs and their lives, and would send the strongest of messages to New York Life, and other insurers, that they cannot, intentionally or inadvertently, allow this type of conduct to occur among their agents without exposing themselves to substantial liability. However, that is not the issue in this case as it currently stands before the Court. The issues presented to the Court by defendant's motion for summary judgment focus not upon New York Life's wrongful acts or those of its agent, but upon the plaintiffs' diligence in protecting their rights. The Court has struggled greatly with this decision, because of its empathy for plaintiffs' plight. However, after much careful consideration of the undisputed facts in light of the applicable law, the Court is persuaded that plaintiffs unfortunately sat on their suspicions for too long and have now lost the right to pursue

the great majority of their claims. Thus, this case sends a message to potential plaintiffs as well.

Based on the foregoing,

IT IS ORDERED that defendant's Motion for Summary Judgment is granted in full with respect to Counts I, III, and VI of plaintiffs' Amended Complaint. The motion is further granted with respect to that portion of Count II concerning the claims for fraud and for the conversion of Wilma Shupak's $20,000.00. The motion is further granted with respect to all claims asserted in Count IV, with the exception of the claims based on the lapse of policy No. 37–849–128 and defendant's negligent failure to conduct an investigation in 1986, when requested by plaintiffs to do so.

IT IS FURTHER ORDERED that ruling on defendant's motion for summary judgment on Count V of the Amended Complaint is reserved, pending further briefing by the parties. Defendant shall file a supplemental brief addressing the remaining issues on or before March 15, 1991, with further briefing thereafter in accordance with Local Rule 220–1 of this Court. Specifically, the Court desires further briefing regarding:

(1) whether the theory of breach of an implied covenant of good faith and fair dealing applies in this case; and

(2) if so, whether the claim sounds in contract or in tort, for purposes of determining the type of damages recoverable by plaintiffs and the applicable statute of limitation.

IT IS FURTHER ORDERED that plaintiff's Motion to Compel is granted, to the extent that defendant shall provide plaintiffs with copies of all complaints filed with the Montana Insurance Commissioner by New York Life policyholders prior to January, 1988 concerning New York Life agent Harold Schwan, provided that defendant shall redact the names and addresses of the complaining policyholders.

IT IS FURTHER ORDERED that a status conference will be held in the Chambers of the undersigned on Friday, March 29, 1991, at 9:00 o'clock a.m., for the purpose of discussing further proceedings in this matter, including (1) setting a trial date, (2) reassignment of the case to another Judge of this District for trial, and (3) the prospects for settlement.

The Clerk is directed forthwith to notify counsel for the respective parties of the making of this order.